
*Minute Order Form (06/97)*

JS-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 8377 | **DATE** | 1/16/2001 |
| **CASE TITLE** | SINGLA et al vs. ADVENTIST HEALTH PARTNERS INC | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Pursuant to Memorandum Opinion and Order entered this day, defendant's motion for summary judgment is granted. This action is dismissed in its entirety. All pending motions are moot. Pretrial conference date of January 18, 2001 and trial date of January 22, 2001 are stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | JAN 17 2001 date docketed | 31 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | *mw* docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 1/16/2001 date mailed notice | |
| JS | courtroom deputy's initials | | JS mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ABHIN SINGLA AND BRUCE ROPER, )
)
Plaintiffs, )
)
v. ) No. 99 CV 8377
)
ADVENTIST HEALTH PARTNERS, INC., )
Formerly known as ADVENTIST HEALTH )
PARTNERS, LTD., )
)
Defendants. )

DOCKETED
JAN 1 7 2001

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Plaintiffs Abhin Singla and Bruce Roper, both licenced physicians, filed a two-count complaint alleging discrimination on the basis of color, race, national origin, and religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et. seq.. Both plaintiffs also initially claimed retaliation, but have not defended those claims in response to this motion for summary judgment, thereby waiving them. Defendant Adventist Health Partners, Inc. ("AHP") filed a motion for summary judgment, arguing that plaintiffs cannot state a prima facie case of discrimination and have not raised a genuine dispute that AHP's stated reasons for failing to renew their employment contracts was a pretext for discrimination. For the reasons stated, AHP's motion for summary judgment is GRANTED.

## STATEMENT OF FACTS

Beginning in the Spring of 1996, AHP's predecessor began to aggressively expand its market

1

penetration by expanding existing hospital-based physician practices, purchasing other existing practices, and establishing new practices or "cold start-ups." As part of that process, AHP purchased one internal medicine practice and established four other cold start-up internal medicine practices, including Oak Brook Medical Associates. These offices were the first internal medicine sites owned by AHP. All of the physicians AHP hired for these internal medicine start-up sites were minority physicians.

Plaintiff Singla is an East Indian doctor who practices Hinduism. Dr. Singla was hired for the Oak Brook site in Spring of 1997. Plaintiff Roper is a black doctor of Jamaican decent who was hired for the Oak Brook site in the Fall of 1997. Both plaintiffs signed AHP's standard two-year employment contract, which provided that either party could terminate by giving ninety days notice prior to the end of the two-year term, that the contract constituted the entire agreement between the parties and superseded any and all other agreements whether oral or written, and that any changes or modifications to the agreement had to be in writing to be effective. The term of the agreement was to automatically renew unless either party gave 90 days written notice of its intent not to renew. Plaintiffs maintain that they were told that the Oak Brook office would be held open and they would receive financial support for four years. Plaintiffs worked at the office with one other physician, Dr. Lin.

AHP's internal medicine cold start-up growth strategy proved to be a financial failure. AHP anticipated losses for the first few years of the offices, but the actual losses were greater than the budgeted losses. In 1997, AHP's budget was a loss of approximately $4.5 million and its actual loss was $5.1 million. In 1998, AHP's actual loss was approximately $4.8 million. In 1998, AHP's management began seriously to question the soundness of continuing to incur losses from its internal

medicine start-up growth strategy. As a result, AHP closed two of the four internal medicine cold-start-up sites in 1998. By the start of 1999, Oak Brook and Bloomingdale were the only remaining cold start-ups, and they were budgeted to lose a combined total of $763,332 in 1999.

The success of practices at AHP was measured in various ways. The primary figure used by the Operations Committee in assessing practice growth was a doctor's monthly ambulatory patient encounters. "Ambulatory patient encounters" refers to the AHP offices' patient, home, and nursing home encounters. AHP also employed "Practice Building Recommendations" designed to help fixed salary contract physicians toward a production-based arrangement. Those not meeting the parameters were expected to take significant additional steps to build their practices. The "Practice Building" parameters were not the benchmarks used to evaluate the success of practices.[1]

In 1998, the Oak Brook office lost $550,000, the largest loss of any AHP practice site, but less than the budgeted loss of $630,000. For 1999, the Oak Brook office was budgeted to loose more than $500,000. As of March 12, 1999, the Oak Brook offices's actual annualized patient encounters were below the budgeted numbers, and were the worst of any AHP office site. The February 1999 Monthly Operations Report showed that the three physicians at the Oak Brook office, including the two plaintiffs, were on a combined pace to see fewer than 1,000 patients in 1999. That combined pace was even lower than the next lowest pace for any individual AHP physician. However, at the time of the meeting, Dr. Singla (but not Dr. Roper) was individually ahead of his budgeted adjusted charges (income). Dr. Singla also exceeded the "Practice Building" parameters for encounters.

---

[1] Plaintiff s denied this statement in their Local Rule 56.1(b) response to AHP's 56.1(a) statement of material facts. However, plaintiffs did not cite to any part of the record in support of their denial. Accordingly, under the Local Rules, the fact is deemed admitted. See Local Rule 56.1(b)(3)(B).

3

Prior to a March 12, 1999 Operations Committee meeting, Dr. Lin informed the Committee that he would be leaving AHP and would not be seeking a renewal of his contract. At the March 12, 1999 meeting, the Committee voted to close the Oak Brook office and not to renew the contracts of Drs. Singla and Roper at the end of their current terms in order to cut losses in 1999 and in future years. It was decided that the Oak Brook office would be closed effective April 30, 1999. There were no other locations where plaintiffs could be transferred without incurring losses similar to those incurred at Oak Brook, but after the office was closed, AHP would continue to honor the plaintiffs' employment contracts through their duration.

AHP sent plaintiffs a letter formally informing them of the decision not to renew their contracts and to close the Oak Brook office on March 17, 1999. The letter explained that AHP did not have the finances available to allow two or three more years of $500,000 losses, and that "trying to force an internists [sic] is too contrived and would not work in the long run." The letter also acknowledged that plaintiffs "were not solely responsible for the poor growth" and that things "could and should have been done differently by the group and the Committee." Plaintiffs requested a meeting with AHP Operations Committee doctors on March 22, 1999. In that meeting, AHP agreed to delay the announcement of the closing pending plaintiffs' submission by April 3, 1999 of a plan drafted by plaintiffs for future development of the site. The plan was to have listed specific activities that plaintiffs would undertake to develop the practice at the Oak Brook site. Plaintiffs never submitted any development plans, explained their failure not to do so, nor provided any constructive ideas or information to AHP on how plaintiffs would achieve a successful practice in the future.

Thereafter, attorneys for AHP and plaintiffs' attorneys attempted to negotiate a plan for the transition of the Oak Brook practice. When no buy-out agreement was reached by May 25, 1999,

4

AHP's counsel notified plaintiffs' counsel that unless a definitive agreement for the sale of the practice to plaintiffs was reached by June 1, 1999, AHP would notify patients at the close of business on June 1, 1999 that the practice would close effective June 20, 1999. No agreement was reached and plaintiffs were informed on Friday, June 18 that a notification letter would be sent to plaintiffs' patients the following Monday announcing the closure of the Oak Brook office on June 30, 1999.

On July 8, 1999, AHP informed Dr. Roper by letter that he would continue to be paid for the duration of his agreement term ending November 30, 1999, and that he was expected to honor his agreement terms as well. The letter stated that "seeing and billing for services yourself (other than on behalf of AHP) would be a breach of contract and would not be covered by AHP's professional liability insurance. Such a breach of contract could jeopardize the remainder of your salary and benefits." Dr. Roper was paid after he stopped working for AHP on June 30, but his contract also required AHP to provide him with an office and staff at AHP's expense. After June 30, 1999, AHP did not provide Dr. Roper with an office or staff at its expense. AHP stopped paying Dr. Roper in August 1999, when it discovered that Drs. Roper and Singla had established a medical practice on a different floor of the same building as AHP's Oak Brook office, using the same name as AHP's Oak Brook practice, and were treating former AHP patients.

Plaintiffs point to several pieces of evidence as reflecting a discriminatory animus. First, plaintiffs state that "racially and ethnically derogatory terms were employed by certain members" of the Operations Committee at meetings. However, the only specific derogatory words cited by plaintiffs are one occasion when the words "camel jockey" were allegedly used in reference to some unknown Middle Eastern doctor, and another instance in which another doctor was "accused" of not

speaking English. Plaintiffs also allege that other practices received more marketing support than their own, though Dr. Singla could not recall any specifics of the alleged inequity in marketing. Plaintiffs were not given an exterior sign they requested, but none of the start-ups had an exterior sign, and Dr. Singla testified that he had no reason to believe that he was not given a sign by AHP because of his national origin, race, or religion. In addition, plaintiffs were not included in some managed care directories published by independent insurance companies in 1998. AHP simply provides information regarding its doctors to the insurance companies, and cannot control which doctors are included in such directories. AHP corrected the situation with the managed care companies as soon as it was made aware of the problem and plaintiffs were included in the 1999 directory.

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1996). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 106 S. Ct. 2548,

6

2553 (1986). There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249, 106 S. Ct. at 2511.

## ANALYSIS

In order to prevail on a sex or national origin discrimination claim under Title VII, a plaintiff must either offer direct evidence of discrimination or proceed under the McDonnell Douglas burden-shifting method. Smart v. Ball State University, 89 F.3d 437, 439 (7th Cir. 1996); Hiatt v. Rockwell Int'l Corp., 26 F.3d 761, 767-68 (7th Cir. 1994). Plaintiffs do not offer any direct evidence of discrimination, and therefore utilized the McDonnell Douglas burden-shifting framework to prove their case. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, plaintiffs may establish a prima facie case of discrimination based on their race, color, national origin, or religion by showing that: (1) they were members of a protected class; (2) they were meeting AHP's legitimate performance expectations; (3) they suffered adverse employment action; and (4) AHP treated similarly situated doctors outside the protected class more favorably. See Thorn v. Sundstrand Aerospace Corp., 207 F.3d 383, 386 (7th Cir. 2000); Gonzalez v. Ingersoll Mill Mach. Co., 133 F.3d 1025, 1032 (7th Cir. 1998). If plaintiffs can establish a prima facie case, the burden shifts to AHP to state a legitimate, non-discriminatory reason for the decision not to renew plaintiffs' employment contracts. See Stalter v. Wal-Mart Stores, Inc., 195 F.3d 285, 289 (7th Cir. 1999). If the employer meets this burden of production, it rebuts the presumption of discrimination, see Loyd v. Phillips Bros., Inc., 25 F.3d 518, 522 (7th Cir. 1994), shifting the burden back to the employee to show that the employer's stated reasons for its action are pretextual. Debs v. Northeastern Illinois University, 153 F.3d 390, 395 77 (7th Cir. 1998).

AHP argues that plaintiffs cannot establish a prima facie case of discrimination because the

undisputed material facts demonstrate that plaintiffs were not meeting AHP's legitimate expectations and that AHP did not treat similarly situated employees outside of plaintiffs' protected class more favorably. AHP further argues that, even if plaintiffs could establish a prima facie case of discrimination, they have presented no evidence to suggest that AHP's stated reasons for deciding not to renew their employment contracts were a pretext for discrimination.

This court believes that plaintiffs have not raised a genuine issue of material fact regarding whether they were meeting AHP's legitimate expectations. Plaintiffs submitted evidence that the Oak Brook office, while incurring huge losses, actually lost less than was anticipated. As such, plaintiffs argue, they were meeting AHP's budgetary expectations, regardless of how poorly their practice was performing. Such evidence to prove that plaintiffs were meeting AHP's legitimate expectations is tenuous, at best, as AHP legitimately could decide that such losses could no longer be tolerated and to discontinue the practice. However, plaintiffs have admitted (by failing to cite any evidence to the contrary in their "denial") that the number of ambulatory patient encounters was the primary method by which AHP evaluated practice growth. Plaintiffs have also admitted that, by this measure, their practices combined performed more poorly than the next-lowest doctor alone. As such, any evidence that plaintiffs were meeting any other "expectations" of AHP is largely irrelevant. Plaintiffs have admitted that they were not meeting AHP's expectations on the one factor that counted most -- the number of patients they saw.

This court is also skeptical that plaintiffs have met their burden of presenting evidence showing that other doctors who are not in the protected class were treated more favorably. Plaintiffs point to no similarly-situated doctor who was not terminated after a record of low patient encounters. That said, the only doctors employed by AHP who were similarly situated (employed by a AHP

8

start-up internal medicine practice) were all minorities. Because of the difficulty of comparing the treatment of plaintiffs to any doctors who were not in the protected class, this court declines to address this issue further.

The Seventh Circuit has recognized although that although the prima facie case is technically the first step in the burden-shifting method, courts may bypass the prima facie case to consider whether the plaintiff met its burden of showing pretext. Burton v. Southwestern Bell Mobile Systems, Inc., 2001 WL 13140, at *3 (7th Cir. Jan 02, 2001). Here, AHP has offered legitimate, non-discriminatory reasons for the decision not to renew plaintiffs' employment contracts. First, the Oak Brook office was in serious financial trouble and AHP did not believe that the company could continue to sustain such losses. Second, the February 1999 Monthly Operations Report showed that the three physicians at the Oak Brook office, including the two plaintiffs, were on a combined pace to see fewer than 1,000 patients in 1999. That combined pace was even lower than the next lowest pace for any individual AHP physician. The number of patient encounters was the most important factor to AHP in assessing practice growth. Given those legitimate reasons, the burden shifts to plaintiffs to show that AHP's stated reasons for its action are pretextual. Because it is clear that plaintiffs have presented no evidence to suggest that AHP's stated reasons for deciding not to renew plaintiffs' employment contracts was not a pretext for discrimination, this court resolves this motion by addressing the issue of pretext.

Pretext requires that plaintiffs demonstrate that AHP's stated reasons for deciding not to renew their contracts were a lie. Kulumani v. Blue Cross Blue Shield Ass'n, 224 F.3d 681, 685 (7th Cir. 2000). Plaintiffs can demonstrate pretext with evidence showing that AHP's proffered reasons are not credible, lack a basis in fact, did not actually motivate the decision to terminate them, or were

9

insufficient to motivate the discharge. Freeman v. Madison Metro. Sch. Dist., No. 99-1448, 2000 WL 1640952, at *3 (7th Cir. Nov. 2, 2000).

Here, plaintiffs occupy three paragraphs of their response brief with the legal standard for assessing pretext, and then give three reasons that the decision was pretextual: (1) AHP has given differing explanations for closing Oak Brook, first citing budget concerns and later poor levels of ambulatory encounters; (2) that AHP set out the 1999 budgets in October 1998, but decided that the amount set for loss was unacceptable only three or four months later; and (3) that AHP's stated reason of fearing failing to meet the 2000 budget is not justified because the budget had not been devised, AHP added physicians after terminating plaintiffs' practice and the 1999 budget included a projection for adding one more physician.

As to plaintiffs' first reason, plaintiffs confuse "differing" reasons with "conflicting" reasons. AHP has indeed offered multiple explanations for the decision to close Oak Brook, but has not offered conflicting explanations for the decisions. While conflicting explanations may be probative of pretext, Emmel v. Coco-Cola Bottling Co., 95 F.3d 627, 634 (7th Cir. 1996), employers are free to offer more than one reason for adverse employment decisions. In fact, when an employer offers multiple reasons for the employment action, the plaintiff must "examine each reason given by [the employer] and must raise an issue of fact regarding the honesty and credibility of each of the reasons." See, e.g., Adreani v. First Colonial Bankshares Corp., 154 F.3d 389, 395 (7th Cir. 1998). Here, AHP's multiple reasons for deciding to close Oak Brook and to not renew plaintiffs' employment contract do not conflict. Every reason ever proffered by AHP concerns the potential (or lack thereof) for profitability at Oak Brook, and the inability of plaintiffs to save the practice.

Moreover, plaintiffs' pretext argument ignores the most important reason given for the

10

decision not to renew plaintiffs' contracts -- poor levels of patient encounters. Plaintiffs have not offered a shred of evidence to suggest that the low levels of patient encounters was a pretext for discrimination, nor could they. Plaintiffs have admitted that ambulatory encounters was the primary factor used by AHP to evaluate practice growth, and have not disputed that their numbers were significantly lower than any other AHP start-up internal medicine practice. Because plaintiffs have not refuted this legitimate, nondiscriminatory reason for the decision to terminate their employment, they cannot survive summary judgment on their Title VII claims.

Although plaintiffs' failure to refute even one of AHP's legitimate reasons for its decision renders the remainder of their attacks on the other reasons irrelevant, it should be noted that plaintiffs' other arguments fare no better. Plaintiffs have offered no reason to suggest that AHP should have been satisfied with the budgeted losses, nor that AHP was disingenuous in determining that it could no longer afford to incur such losses. The same reasoning applies to plaintiffs' attack on the reasons relating to the 2000 budget. AHP did not need a 2000 budget drawn out in order to know that massive losses would be difficult, if not impossible, to bear. Moreover, it is undisputed that AHP eliminated every start-up practice and did not add any doctors to any start up practice in 2000. Finally, and most importantly, plaintiffs have not produced a single shred of evidence to suggest that the decision to terminate their employment or not to provide them with more marketing support was motivated by racial or religious animus. The only racially-charged language that plaintiffs point to is the use of the term "camel jockey" allegedly used by and unknown doctor in reference to another unknown doctor at an Operations Committee meeting. Plaintiffs do not present any evidence that any decision-maker ever used a derogatory term. Stray workplace comments unrelated to the decision to terminate and made by nonparticipants in the decision do not serve as

evidence of any discriminatory intent. See Cowan v. Glenbrook Sec. Sys., Inc., 123 F.3d 438, 443 (7th Cir. 1997). Finally, comments regarding the fact that a doctor did not speak English made at an Operations Committee meeting do not, in themselves, demonstrate ethnic prejudice. Whether a person is proficient in English is a question of fact, and plaintiffs offer no evidence to suggest that the comments were derogatory.

## CONCLUSION

For the reasons stated, defendant AHP's motion for summary judgment is GRANTED. This case is dismissed in its entirety. All pending motions are MOOT

ENTER:

*James F. Holderman*

JAMES F. HOLDERMAN

United States District Judge

DATE: January 16, 2001